George M. JONES, Individually and as General Partner of San Mateo Properties, Ltd., a Texas Limited Partnership, and San Mateo Properties, Inc., Petitioners,

v.

DRG FINANCIAL CORPORATION, Respondent.

No. C–5183.

Supreme Court of Texas.

Jan. 7, 1987.

George W. Bramblett, W. Alan Wright, Haynes and Boone, Dallas, for petitioners.

Lewis T. LeClair, Jenkens, Hutchinson & Gilchrist, Dallas, Howard Possick, Arent, Fox, Kintner, Plotkin & Kahn, Washington, D.C., for respondent.

KILGARLIN, Justice.

Claiming damages resulting from breaches of contract and fiduciary duty, George M. Jones, an investor, sued DRG Financial Corporation, a business specializing in securing federally insured loans. Based on jury findings of fraud, breach of fiduciary duty, and breach of contract, the trial court rendered judgment for Jones. The court of appeals, in an unpublished opinion, reversed and rendered judgment for DRG, finding no evidence of causation. We have determined that there is some evidence of causation and, therefore, reverse the judgment of the court of appeals and remand the cause to that court for consideration of points presented to, but not ruled upon by, that court, because of its no evidence holding.

George M. Jones was involved in the construction of a 204–unit apartment complex in the Dallas area. In 1973, he received from Texas Bank and Trust Company of Dallas construction financing in the amount of $2,700,000. The loan was increased by $1,000,000 in 1975 in order to cover an anticipated increase in construction costs and delays. At this time, Texas Bank and Trust required Jones to pledge collateral in addition to the apartments as security for the loan. On September 18, 1975, construction was completed and the complex received a certificate of occupancy.

Jones could not locate permanent financing for the complex and therefore, on October 9, 1975, Texas Bank and Trust demanded immediate loan repayment. On December 2, 1975, after notice of foreclosure, Jones and the bank entered into an agreement providing that Jones convey fourteen separate properties to the bank in return for the bank crediting his indebtedness with $1,995,080. This left an unpaid balance of $1,189,215.23. The bank also granted Jones an option to repurchase all fourteen pieces of property at a specified price, conditioned upon Jones delivering to the bank by April 30, 1976 an unconditional loan commitment for $2,600,000. The agreement further provided for an extension of the option to purchase the apartments until July 31, 1976, if Jones was able to timely deliver the permanent loan commitment.

In February 1975, prior to this agreement, Jones had contacted DRG Financial Corporation, a Washington, D.C., based corporation specializing in securing federally insured loans, and sought its assistance in obtaining an FHA insured loan from the Department of Housing and Urban Development (HUD). DRG responded to this contact by sending a contract to Jones, but Jones did not follow up. In October 1975, Jones again contacted DRG, which resulted in a personal meeting with a DRG official, Robert Tyson. At this meeting Jones was told that it would take sixty to ninety days to obtain a conditional commitment from the Department of Housing and Urban Development. By letter dated December 5, 1975, Phillip Breland, Jr., vice-president of DRG, instructed Jones as to the materials and documents that he was to furnish to DRG in order to process the application. The deadline for such documents was December 12, 1975. DRG informed Jones that unaudited financial statements would be accepted by HUD for three months after the completion of the apartment project, if he could provide proof that a certificate of occupancy was issued September 16, 1975. After December 16, 1975, three months after the certificate of occu-

pancy was issued, only audited financial statements would be accepted.

Jones contacted his accountant, Arthur White, and requested preparation of unaudited financial statements within one week. A letter agreement, dated December 5, 1975, between White and Jones was received into evidence. It stated that "based upon [Jones'] communication with FHA and others, that unaudited financial statements for the period September 18, 1975 (the date when certificate of occupancy was actually issued) through November 30, 1975, is all that is necessary to meet the requirements for your application for refinancing with the FHA by December 18, 1975."

On December 17, 1985, DRG and Texas Bank and Trust, the record owner of the apartment project, entered into an agreement whereby DRG was given the exclusive right to represent the bank in all phases of application for conditional commitment and firm commitment from HUD and to place permanent financing. The agreement required DRG to be present whenever the client met with HUD, and the client was required to provide all exhibits and materials needed. An addendum to the agreement was attached, stating that Texas Bank and Trust was applying for financing in order to facilitate sale to Jones of the apartments. The addendum further required Jones to pay the HUD application fee and DRG's fee.

On December 17, 1975, Jones and Breland met with HUD and submitted the application. By letter of January 14, 1976, Breland was notified that the Dallas office of HUD had rejected the application because it was deficient, in that the financial statements were unaudited instead of audited, as required. The Dallas HUD office took the position that because the project had occupancy before the Certificate of Occupancy was issued, additional financial statements were necessary. These included a balance sheet, an operating statement, and a Statement of Changes in Financial Position, all of which were to be audited. Furthermore, the HUD Dallas Area Office

and the Regional Office indicated that there were other considerations regarding the acceptability of the project. In addition to the matter of occupancy for an extended term prior to the final occupancy permits being issued there were questions regarding the owner of record and whether the project could qualify as a purchase transaction. The questions involved the finality of the foreclosure procedures and any peripheral agreements that may have existed regarding that transaction.

Breland testified that DRG continued to work on the application, despite the rejection, hopeful that they could prevail on HUD Central in Washington, D.C., to accept the application based upon unaudited statements. On January 30, 1976, the application was again filed in the Dallas office by DRG. In early February, DRG wrote to HUD Central about the Jones/San Mateo Project, stating:

To summarize our concerns, we have met with a great deal of resistance to the suggestion that audited statements may be required for occupancy occurring during the construction of a project. We feel strongly that the difficulty and lack of utility of financial statements covering construction period occupancy far outway [sic] the highly questionable value of such statements, and in fact we have encountered a number of cases in which the possibility of such required statements represent a serious hindrance to our ability to generate applications to FHA under the special eligibility provisions of Section 223(f). These issues and concerns will become more acute as we approach the June 30 deadline for the filing of applications under the special eligibility provisions of the program.

In the case of the San Mateo Apartments in Dallas, for instance, we are representing the Texas Bank which is now owner of the project through obtaining the deed in lieu of foreclosure during mid December. When we attempted to file application for the project, which was completed during late September and early October, we were advised that an audit of the

construction period occupancy for the preceeding [sic] year would be required. The rent roll which was supplied in our application package indicated that pre-construction completion rentals began with two units which were rented late in 1974. By the date of completion of the project, no more than about 15% of the total number of units in the project had been rented, and all of those were rented at rates which are somewhat below stabilized rental rate levels in the marketplace. However, as a result of the confusion and delay surrounding the question of whether the audited statements would be required, the Texas Bank is now reevaluating the practicalities of proceeding with 223(f) applications on several projects in which they have an interest either as owner or lender.

By a letter dated February 24, 1976, DRG learned from HUD that the Jones application had again been rejected. At this time DRG told Jones that a directive may soon issue from the HUD office in Washington which would render the application acceptable with unaudited statements. Breland offered Jones two alternatives: DRG could continue its efforts to obtain a waiver of the requirement of audited statements, or DRG could refile with audited financial statements. Jones and Breland both testified that Jones instructed Breland to continue DRG's attempts to persuade HUD to accept the application with unaudited financial statements. Jones had previously contacted his accountant, Arthur White, and was told that it was not possible to obtain audited financial statements.

On March 12, 1976, HUD's Washington office issued a directive allowing projects completed more than six months from the date of application to submit unaudited financial statements. Since Jones' certificate of occupancy was dated September 18, 1975, the six months would theoretically expire on March 18, 1976, assuming occupancy occurring before the date of certification was irrelevant. The evidence is unclear when this fact was communicated to HUD's Dallas office or when DRG learned

this information. However, on March 25, 1976, a memo was sent to Breland in the DRG Texas office from Ogilvee in the DRG Washington, D.C., office concerning the March 12 directive. The memo informed Breland that since the project was completed in late September or early October, the case must be filed within the next week or two or it might go beyond the six months during which an exemption on audits was granted. DRG did not file an application for Jones after the March 12 directive. Breland testified that Ogilvee was not aware of the problem they were having with the Certificate of Occupancy.

By letter dated April 12, 1976, DRG Texas contacted Jones concerning the status of his application, informing him that if Texas Bank and Trust could establish an actual completion of construction date of October 28, 1975 and the case was filed by April 28, then the HUD Dallas office might accept unaudited financial statements. At this time Jones contacted HUD Dallas directly, requesting a report on his application. By letter dated April 27, 1976, HUD Dallas informed Jones that due to the occupancy of the project, the proposed rent schedule and the current market conditions, it was doubtful that the project could reach sustaining occupancy within the required time limit. Therefore, HUD Dallas discouraged resubmission of the application.

On April 30, 1976, DRG refunded Jones' application fee, the date upon which Jones' option to repurchase expired. By letter of May 18, 1976, Texas Bank and Trust informed Jones of the termination of his option and management rights effective April 30, 1976. On June 3, 1976, DRG entered into an agreement to assist Texas Bank and Trust in processing its own application for an FHA-insured loan. Arthur Anderson & Co. was hired to prepare financial statements and upon submission of the application, a conditional commitment was issued to the bank in November 1976.

Jones filed suit against DRG, alleging breach of contract and breach of fiduciary duty. Jones contended that DRG failed to

adequately assist him in obtaining FHA financing which caused his inability to repurchase the apartments within the time frame of his option with Texas Bank and Trust. The jury answered issues establishing Jones' right to recovery.

The court of appeals reversed the judgment of the trial court, finding no evidence that any failure of DRG caused Jones' inability to repurchase the apartments within the time frame of the option. The court of appeals considered testimony that Jones' application was continuously refused because Jones was not able or willing to provide audited financial statements of the type required by HUD for the submission of a loan application. Furthermore, in spite of evidence to the contrary, the court of appeals concluded that the Bank's application was accepted due to its submission with an audited financial statement. The court of appeals determined that there was no evidence to support the trial court's finding that a loan commitment from HUD to Jones would have been made on or before the April 30, 1976 deadline for Jones to exercise his option.

When reviewing a judgment on a no evidence ground, an appellate court should only consider the evidence and inferences tending to support the trial court's judgment, and disregard all evidence and inferences to the contrary. *Stedman v. Georgetown Savings & Loan Ass'n*, 595 S.W.2d 486, 488 (Tex.1979). Although the court of appeals purported to apply this test, it in fact did not. The court of appeals relied only on evidence contrary to the findings of the trial court. This evidence should have been disregarded. Correct application of the no evidence standard yields some evidence to support the trial court's finding of causation.

At trial, a Texas Bank and Trust official who handled the matter testified that their application did not contain a clean audit. Furthermore, the financial statement prepared by Arthur Anderson & Co. contained figures which were accompanied by the notation "unaudited." Nevertheless, as to the same apartment complex, the bank's application was granted and that of Jones denied. Therefore, from this we determine that more than a scintilla of evidence exists to support the finding that it was DRG's conduct, rather than Jones' failure to obtain audited financial statements, which caused Jones' inability to obtain financing and exercise his option to repurchase the apartments.

We reverse the judgment of the court of appeals and remand the cause to that court for consideration of points presented to it, but upon which the court of appeals did not rule because of its "no evidence" holding. Among these points are arguments which, if sustained, would result in a modification of the trial court's judgment or a remand for new trial. We agree that the parties are entitled to have these points considered under the rule of *McKelvy v. Barber*, 381 S.W.2d 59 (Tex.1964). We have the option of (1) examining the points not considered by the court of appeals in order to determine whether any will support affirmance of that court's judgment, or (2) remanding the cause to the court of appeals for it to pass on those points. *Roark v. Allen*, 633 S.W.2d 804, 811 (Tex.1982). Because the unaddressed points of error include attacks on the factual sufficiency of the evidence, which must be reviewed in accordance with the guidelines set forth in *Pool v. Ford Motor Co.*, 715 S.W.2d 629 (Tex.1986), we deem it expedient to remand the entire cause to the court of appeals. *Montfort v. Jeter*, 567 S.W.2d 498, 500 (Tex.1978).

MAUZY, J., not sitting.